## In re G. C. Murphy Company

*Ben Paul Jubelirer,* for appellant.

*Sydney G. Handler,* for intervening appellant.

*Charles M. Christler,* for Labor Relations Board.

ELLENBOGEN, J., June 17, 1944.—This case comes before us on an appeal of the Retail Clerks International Protective Association, Local No. 1365, which seeks to set aside a final order of the Pennsylvania Labor Relations Board wherein it was adjudged and

decreed that the employes of G. C. Murphy Company in the store located at 719-723 East Ohio Street, Pittsburgh, Pa., have not selected or designated the Retail Clerks International Protective Association, Local No. 1365, as their exclusive bargaining representative. The Pennsylvania State Federation of Labor, which had been permitted to intervene by the Pennsylvania Labor Relations Board, was allowed to intervene in this court as a party appellant.

The case had its inception in a petition of March 6, 1942, filed by Ann Koehler, representative of more than 30 percent of the employes of the Murphy store, which averred that Local Union No. 1365 no longer represented a majority of the employes and that the employes did not desire further representation by Local No. 1365.[1]

The board directed an investigation and fixed a time and place for a hearing. Two weeks later, Local No. 1365 filed charges of unfair labor practices against the G. C. Murphy Company, and the board directed that these be heard simultaneously with the petition of Ann Koehler. A trial examiner of the board conducted hearings and took testimony. Thereafter, the board issued a nisi decision which contained findings of fact, a discussion, conclusions, and a separate order in each case. It dismissed the charges of unfair labor practices, ordered an election by secret ballot, and held

---

[1] The petition alleged: "That a question has arisen concerning the representation of employes of the said employer, in that a great majority of the said employes do not desire representation by said A. F. of L. Retail Clerks Association, Local Union No. 1365, and feel that there is no necessity for being represented by said Local Union No. 1365. The said Local No. 1365 was previously certified by Your Honorable Board in proceeding no. 23, year of 1941. A contract presently exists between the G. C. Murphy Company and Local No. 1365 which is about to expire. The employes do not desire further representation by Local No. 1365 upon the expiration of the contract."

that 66. employes on the payroll of the company on March 31, 1943, were qualified to vote.

The union and the Pennsylvania State Federation of Labor filed exceptions to the decree nisi and on September 30, 1943, all exceptions were dismissed and it was ordered that an election be held on October 15, 1943. The union abstained from participating in the election and out of 66 qualified employes 24 participated, all of whom cast their ballots against representation by Local No. 1365. On October 22, 1943, the board issued a final order in which it adjudged and decreed that ". . . the employes of G. C. Murphy Company in the store located at 719-723 East Ohio Street, North Side, Pittsburgh, Pa., have *not* selected or designated the Retail Clerks International Protective Association, Local No. 1365, a labor organization affiliated with the American Federation of Labor, as their exclusive bargaining representative, and that the said Retail Clerks International Protective Association, Local No. 1365, a labor organization affiliated with the American Federation of Labor, is *not* the collective bargaining representative of the employes of the G. C. Murphy Company in the said defined appropriate unit in matters pertaining to wages, rates of pay, hours of employment and other conditions of employment." (Italics supplied.)

From this order, Local No. 1365 filed this appeal. It raises the question whether the Pennsylvania Labor Relations Board has jurisdiction to entertain a petition averring that a majority of the employes in an appropriate unit do *not* desire further representation by the labor organization which had previously been certified by the board and to issue a certificate that the employes have *not* designated such union as their exclusive bargaining representative, and that such union is *not* the collective bargaining representative of said employes. The board answered this question in the affirmative and issued such a certificate.

The Pennsylvania State Federation of Labor, intervening appellant, contends that, if sustained, this decision could have far-reaching effects. It avers in its petition to intervene that this involves matters "which affect the fundamental principles of the Pennsylvania Labor Relations Act, and is so far-reaching in its effects as to alter the basic public policy pursuant to which the Pennsylvania Labor Relations Act was enacted", and that if upheld it will disrupt "existing harmonious relations . . . between organized labor and management, will create chaos in the field of labor relations, and will destroy those principles which encourage collective bargaining and the institution of industrial democracy which rests thereon". The board also considers this question one of great import and is anxious to obtain a court decision.

The petitions for appeal and for intervention also assign as error the order of the board which fixes the payroll of March 31, 1943, as determining the eligibility of employes entitled to vote at the election, since this date is more than one year after the initiation of the petition. This as well as other questions involved in the appeal were not argued at the oral argument, nor are they referred to in the briefs filed by the parties and may, therefore, be considered as having been abandoned. We will limit ourselves to the basic question of jurisdiction.

The question here involved is fundamental and novel. As far as we know it has not been decided by any court. That such jurisdiction exists has been denied by the National Labor Relations Board, by the National Mediation Board, the Massachusetts Labor Relations Board, and by the New York State Labor Relations Board.

The Pennsylvania Labor Relations Act of June 1, 1937, P. L. 1168, was patterned after the National Labor Relations Act of July 5, 1935, 49 Stat. at L. 449: Shafer Petition, 347 Pa. 130, 132. The National act provides in section 9 (c) :

"Whenever a question affecting commerce arises concerning the representation of employees, the Board may investigate such controversy and certify to the parties, in writing, the name or names of the representatives that have been designated or selected. . . ."

This is almost identical with the language employed in section 7(c) of the Pennsylvania Labor Relations Act, which reads as follows:

"Whenever a question arises concerning the representation of employes the board may investigate such controversy and certify to the parties, in writing, the name or names of the representatives who have been designated or selected. . . ."

Interpreting and applying section 9, the National Labor Relations Board, in a long line of decisions, held that where the petitioner does not request that a certain union or individual be certified as having been designated to represent the employes the petition must be dismissed. One of the cases in which the board dismissed the petition is the case of the Solar Varnish Corp., November 18, 1941, 36 N. L. R. B. 1101, 9 L. R. R. 190, in which it was said (p. 1103) :

"We are of the opinion that under the circumstances here disclosed, there is no question concerning the representation of employees. Section 9 of the Act provides only for certification by the Board of *representatives* designated or selected for the purposes of collective bargaining by the *majority of the employees* in a unit appropriate for such purpose'. (See Section 9, Subsection (a) and (c)). The term 'representatives' is defined by Section 2(4) of the Act to include 'any *individual* or *labor organization*'. Thus, certification under the Act is clearly appropriate only when the process of collective bargaining is to be carried on not by the majority of the employees themselves, but by individuals or a labor organization whom the majority designates. In the case before us, the six employees have not formed and designated as their representative

'any organization, or any agency, or employee representation committee or plan.' . . . Nor have they designated any individual to act for them."

The same was held in the case of Tabardrey Manufacturing Company, 51 N. L. R. B. 246, 12 L. R. R. 824 (July 1943). The facts of that case are similar to the facts of this case. In the Tabardrey case a group of employes presented a petition to the board which attacked the asserted claim of a C. I. O. union (which had previously been certified) that it continued to be the exclusive representative of the employes. The petitioners admitted that they were neither organized nor authorized to bargain collectively for the employes. The union opposed an election and did not seek recertification as the exclusive bargaining representative. The board dismissed the petition, saying (p. 249) :

"It has been our general practice, based upon considerations of policy, not to require the only union involved to participate in an election against its desires. Therefore, as a general rule, we do not entertain petitions for investigation and certification of representatives except in cases where it appears that the alleged question of representation is related directly to the right or claim of the petitioner to be recognized as a collective bargaining representative. Here there is no such claim, since by their own admission it is the Petitioners' present purpose not to act as bargaining representative. . . .

"The Petitioners . . . do not insist that their name appear on the ballot; on the contrary they state that they would prefer not to have their name appear thereon. They concede in effect that their basic object in seeking an election is not to obtain the certification of a bargaining representative but rather to check and test the asserted claim of the C. I. O. that it continues to be the exclusive representative. The Company urges that even though the Petitioners are not seeking certification, nevertheless a question concerning representa-

tion may be found in the refusal of the Company to recognize and bargain with the C. I. O. . . .

"Nor do we think that we should, in the circumstances of this case, depart from our general rule and direct an election on the question of whether the C. I. O. is now the representative desired by the majority of the employees. The considerations of policy which impel us to refrain from testing the representative status of a union upon the request of a group of employes who in effect desire no representation for collective bargaining are especially applicable where, as here, the employer is refusing to bargain with the only union claiming representation and that union does not desire an election. Consequently, we shall dismiss the petition. However, our dismissal is not to be construed as a recertification of the C. I. O., nor as a finding that the certification of December 19, 1939, continues to have operative effect. Nor do we decide that the C. I. O. has lost the majority established in the November 1939 election, or that the Company must accept or challenge the C. I. O.'s status as the representative of the employees. These questions are not properly before us in this proceeding."

The New York State Labor Relations Board has likewise refused to entertain petitions where the petitioner does not seek certification as the collective bargaining representative. The first such ruling was made in the Matter of Metropolitan Life Insurance Company, decision no. 1983, where the board held as follows:

"We think that it would not effectuate the policies of the Act to grant intervention to one who does not claim to represent anybody for the purpose of collective bargaining. Callahan does not seek to be certified as the representative of the agents herein for collective bargaining; he does not even claim to represent any agent for that purpose. Indeed he has disclaimed any desire to accept the responsibility of being their representative. His object is wholly negative. Even when a union

has sought to be placed on the ballot we have denied intervention if it failed to show that it represented at least some employes for the affirmative purposes of collective bargaining: Sixth Annual Report of the New York State Labor Relations Board p. 46 n. 284 (1942)."

The New York Board made a similar ruling in the matter of Empire Hairdressers, decision no. 2037. There, as in the case at bar, an employe in conjunction with other employes presented a petition stating that the union which had a collective bargaining agreement with the employer did not "now represent a majority of the employes" and stated that they did not want to be represented by the union in the future. The New York board held that, since the employes did not authorize the petitioner to act as the collective bargaining representative and since the petition did not affirmatively seek any form of collective bargaining representation, no question cognizable by the board was presented: Sixth Annual Report of the New York State Labor Relations Board p. 46 (1942).

The New York State Labor Relations Board characterized such petitions as "negative petitions", concerning which it made this statement in its Sixth Annual Report, p. 46:

"A negative petition is one in which the petitioner does not itself seek to represent or be certified as the representative of employes for the purposes of collective bargaining. Such a petition presents no question or controversy concerning representation and therefore has been dismissed."

In reading the New York decisions it should be remembered that section 705 of chapter 443 of the Laws of 1937 of the State of New York, art. 20, as amended by chapter 518 of the Laws of 1942, subdivision 3, is practically identical with our section 7 (c) as amended.[2]

---

[2] Section 705, as amended, reads as follows:

"Whenever it is alleged by an employee or his representative, or by an employer or his representative, that there is a question

An amendment to the general rules and regulations of the New York State Labor Relations Board of February 1, 1943, precludes the filing of "negative" petitions, by requiring that such petitions contain:

"(*f*)  A request that the board certify the petitioner as the collective bargaining representative of the employes within the bargaining unit or units claimed to be appropriate."

The learned counsel for the Pennsylvania State Federation of Labor has appended to his brief a communication addressed to him by the National Mediation Board of Washington, D. C., signed by Wm. M. Leiserson, its chairman, which states that it is the policy of the board to decline negative petitions.

Counsel for the State Federation states in his brief that the same ruling has been made by the boards of Massachusetts, Minnesota, Utah, and Wisconsin.

In a supplemental brief the Pennsylvania Labor Relations Board contends that the decisions by the National Labor Relations Board, the New York State Labor Relations Board, and other State agencies are not applicable, because they are based upon the respective statutory provisions and are not similar to the provisions of the Pennsylvania Labor Relations Act, as amended in 1939. That contention is not well taken. As decided by our Supreme Court, the Pennsylvania Labor Relations Act was "imitative" of the National Labor Relations Act: Shafer Petition, 347 Pa. 130, 132. While section 9(*c*) of that act provides that the board "*may* investigate such controversy and certify to the parties, in writing, the name or names of the representatives that have been designated or selected", whereas section 7(*c*) of the Pennsylvania act, as amended, provides that the board "*shall* investigate

---

or controversy concerning the representation of employees, the board shall investigate such question or controversy and certify in writing to all persons concerned the name or names of the representatives who have been designated or selected.

such controversy and certify to the parties, in writing, the name or names of the representatives who have been designated or selected", the provisions which determine this case are not the words "may" or "shall", but those which state that the matter to be certified is "the name or names of the representatives *who have been designated or selected*". (The New York act, as amended, also contains the word "shall").

The petition of Ann Koehler as well as the certificate issued by the board is *negative*. The petition avers and the certificate states that Local Union No. 1365 does *not* represent a majority of the Murphy employes. The petition does not aver that any other individual or union represents a majority of said employes and has been designated by the Murphy employes to represent them in collective bargaining, nor does it seek a certificate from the board designating an individual or a union as the bargaining representative of the Murphy employes. The certificate of the board does not designate any individual or union as such representative; but states merely that Local No. 1365 is *not* the collective bargaining representative. This negative character of the proceeding and of the certificate is the basis of the objection by the union and the State Federation of Labor.

The Pennsylvania Labor Relations Board is created by statute and has only the powers and jurisdiction conferred upon it by the acts of assembly. The jurisdiction which the board asserts here must therefore be found in the act of assembly creating and establishing the board and its amendments, or it does not exist.

The Pennsylvania Labor Relations Board was established by the Pennsylvania Labor Relations Act of June 1, 1937, P. L. 1168, 43 PS §211. The petitiion of Ann Koehler was filed and the certificate of the board was issued under section 7(c) of that act which, as amended by the Act of June 9, 1939, P. L. 293, 43 PS §211.7, is as follows:

"Whenever a question arises concerning the representation of employes the board may, and, upon request of a labor organization, or an employer who has not committed an act herein defined as unfair labor practice, or any group of employes in an appropriate unit representing by petition thirty per centum or more of the employes of that unit, shall investigate such controversy and certify to the parties, in writing, the name or names of the representatives who have been designated or selected. . . . Any certification of representatives by the board shall be binding for a period of one year, or for a longer period if the contract so provides, even though the unit may have changed its labor organization membership."

Since Ann Koehler in filing her petition represented 30 percent or more of the employes in the Murphy store, she had a right to file a proper petition and the only question presented here is whether she filed the kind of petition which is provided for in the act. The act of assembly is very specific as to what the board shall do if a proper petition is filed. It provides that the board "shall investigate such controversy" and shall then issue an *affirmative* certificate or, to use the statutory language, it shall "certify to the parties, in writing, the *name or names of the representatives who have been designated or selected*". (Italics supplied.) But the petition of Ann Koehler did not ask the board to certify "the name or names of the representatives who have been designated or selected", as required by the statute. It asked the board for a negative certificate, a certificate that Local No. 1365 did *not* represent the Murphy employes. The board so certified.

A certificate that a certain union does *not* represent the employes is not a certificate of "the name or names of the representatives *who have been designated or selected*" by the employes. Section 7(c) does not authorize or empower the board to issue a certificate that a union or individual is *not* the collective bargaining

agent, nor is there any other section of the act that empowers the board so to certify. Since the acts of assembly do not give the board the right to issue such a negative certificate, the board does not have that power. This interpretation of section 7(c) is not merely a literal construction of the precise language employed in the act but the only construction which is in harmony with the policy expressly stated in the act, with the practices of similar boards, and with the former practice of the Pennsylvania Labor Relations Board itself.

The petition of Ann Koehler was not filed for the purpose of promoting *collective bargaining* but for the purpose of initiating individual bargaining. Every employe has the right to make an individual contract with his employer, if such contract is not inconsistent with a valid and existing collective bargaining agreement, but the Pennsylvania Labor Relations Act of 1937 was passed to promote, advance, and protect collective bargaining and not for the purpose of promoting individual bargaining.[3] The act does not deal with individual bargaining.

The theory of the Pennsylvania Labor Relations Act is that, because of unequal bargaining power and insecurity of tenure, employes cannot obtain proper wages, hours, and working conditions by bargaining individually and that therefore they must be protected in bargaining as a unit (collectively). Section 2 of the act eloquently states that as the purpose of the act and as the policy of the legislature in enacting it:

"Section 2. Findings and Policy—(a) Under prevailing economic conditions, individual employes do not

---

[3] See the opinion of Justice Jackson, speaking for the Supreme Court, in the case of J. I. Case Co. v. N. L. R. B., 321 U. S. 332, decided in the Supreme Court of the United States on February 28, 1944, for the relative position of individual contracts and collective bargaining agreements.

possess full freedom of association or actual liberty of contract. Employers in many instances, organized in corporate or other forms of ownership associations with the aid of government authority, have superior economic power in bargaining with employes. This growing inequality of bargaining power substantially and adversely affects the general welfare of the State by creating variations and instability in competitive wage rates and working conditions within and between industries, and by depressing the purchasing power of wage earners, thus—(1) creating sweat-shops with their attendant dangers to the health, peace, and morals of the people; (2) increasing the disparity between production and consumption; and (3) tending to produce and aggravate recurrent business depressions. The denial by some employers of the right of employes to organize and the refusal by employers to accept the procedure of collective bargaining tend to lead to strikes, lock-outs, and other forms of industrial strife and unrest, which are inimical to the public safety and welfare, and frequently endanger the public health.

"(b) Experience has proved that protection by law of the right of employes to organize and bargain collectively removes certain recognized sources of industrial strife and unrest, encourages practices fundamental to the friendly adjustment of industrial disputes arising out of differences as to wages, hours or other working conditions, and tends to restore equality of bargaining power between employers and employes."

The legislature specifically states in section 2(c) that the act must be so interpreted as to encourage and promote collective bargaining:

"(c) In the interpretation and application of this act and otherwise, it is hereby declared to be the public policy of the State to encourage the practice and procedure of collective bargaining and to protect the exer-

cise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing, for the purpose of negotiating the terms and conditions of their employment or other mutual aid or protection, free from the interference, restraint or coercion of their employers."

In section 2 (*d*) it is stated that "All the provisions of this act shall be liberally construed for the accomplishment of this purpose."

If a negative petition is within the jurisdiction of the board, any employer or 30 percent of the employes could, by merely filing a petition with the board, compel a union to proceed to an election before the union had completed its task of organizing or before it was ready to test its strength. This would leave the selection of the time of an election entirely in the hands of the employer or of 30 percent of the employes and would give the union no voice in that matter. It is obvious that it would be difficult for the union to obtain a majority of the employes at an election which was prematurely called by its opponents. Such a procedure is not calculated to carry out the purposes of the act of assembly and "encourage the practice and procedure of collective bargaining".

Prior to the order entered in this case, the Pennsylvania Labor Relations Board followed the practice of denying negative petitions. Thus in 1938, in J. K. Steliotes Company's Employes Case, no. 194, the board held that "a petition for investigation and certification of bargaining representatives can only be filed by a representative seeking to establish the right to act as the accredited spokesman of the employes"; and in Meyers Dairy's Employes Case, no. 58, in 1940, the board held that "where the purpose of the petitioning union is merely to establish that another union is not the accredited spokesman of the employes, in an appropriate unit, the petition for investigation and cer-

tification of bargaining representatives should be dismissed". This last case was decided by the board subsequent to the amendment of the Pennsylvania Labor Relations Act of June 9, 1939.

It seems to be the position of the board that the decision of our Supreme Court in Shafer Petition, 347 Pa. 130, requires a reversal of its previous position and requires it to entertain a negative petition. That view is not well taken. That case does not deal with the question here presented but merely determines that where a secret ballot is properly requested at an election concerning the representation of employes such request must be granted. No other question was involved in Shafer Petition.

Independent of our determination that the board has no jurisdiction to issue a negative certificate of employe representation, the board's order must be overruled, because the board had before it a controversy which had become moot when it issued its negative certification. The amendatory Act of June 9, 1939, P. L. 293, sec. 7(c), contained this provision:

". . . Any certification of representatives by the board shall be binding for a period of one year, or for a longer period if the contract so provides, even though the unit may have changed its labor organization membership."

It appears from the findings of fact in this case that, after an election held by the board, the board issued an order on April 9, 1941, in which it certified Local No. 1365 as the exclusive bargaining representative of the Murphy employes. Thereafter, viz, on May 7, 1941, Local No. 1365 entered into a collective bargaining agreement with G. C. Murphy Company, effective as of April 5, 1941, which provided that it should terminate on April 13, 1942. The contract also provided that if no written notice was given by either of the parties 30 days prior to the expiration it should continue in force

for a period of one year, and thereafter for a like period of one year until notice of termination was given. On February 11, 1942, Local No. 1365 notified the Murphy Company that it was terminating the existing bargaining contract and requested a conference for the purpose of negotiating a new agreement. In view of the fact that the company had received notice from a number of employes that they were dissatisfied with the union and desired to withdraw from membership, the G. C. Murphy Company refused to negotiate a renewal of the contract until the petition of Ann Koehler had been determined by the Pennsylvania Labor Relations Board. Thus challenged, the union did not press its request for negotiations and the conclusion of a contract. Therefore, it appears that when the employer refused to negotiate with the union because it was questionable whether it still represented a majority of the employes, the union desisted and was satisfied to let the matter rest. Under this admitted state of facts, the certificate designating Local No. 1365 as the bargaining representative and its contract with the G. C. Murphy Company expired on April 13, 1942. The order directing an election to be held in this case was not issued until March 30, 1943, nearly one year after the contract had expired and after the right of the union to represent the Murphy employes had terminated. That is the effect of the amendment of 1939 which provides that "any certification of representatives by the Board shall be binding for a period of one year", unless the contract entered into is for a longer period. Under that amendment the certificate obtained by the union on April 13, 1941, was "binding" for one year only. Thereafter, if the employer questioned the right of the union to represent its employes—as it did in this case—it was incumbent upon the union to seek an election and a new certification from the board, or to abandon its claim that it represented a majority of

the employes. In the instant case the refusal of G. C. Murphy Company to bargain with Local No. 1365 on the renewal of the contract was perfectly legal until the union had proven its claim that it continued to represent a majority of the employes. Thereafter, the union could either file a petition with the Pennsylvania Labor Relations Board for an election and a certification, or it could abandon its claim to majority representation and let the matter rest. In the case at bar, the union did not desire to test its right to represent the Murphy employes, but preferred to abandon its negotiations with the G. C. Murphy Company.

As the matter stood on April 13, 1942, the contract with the union had expired and its certificate of representation was no longer binding. The union had abandoned the negotiations for a new collective bargaining agreement and each individual employe was free to negotiate his own contract. That was the situation when the board on March 30, 1943, issued its order directing an election in which it sought to compel the union to proceed to an election when the union was unwilling to do so and had abandoned its insistence on contract negotiations. This the board had no power to do under the act and there was no occasion for doing so because there was then no pending controversy concerning employe representation or collective bargaining. It was simply a case in which a union which previously represented a majority of the employes dropped the negotiations and abandoned the field when its right to represent the majority of the employes was challenged. This rendered the controversy moot.

Our interpretation of the Pennsylvania Labor Relations Act gives force and effect to the right of employes to withdraw or secede from a union, because under the amendment of June 9, 1939, a union whose majority status is challenged by the employer, by another union, or by an individual seeking to act as the bargaining

representative must either abandon its claim or petition the board for a new certificate designating it as the collective bargaining agent, and before it can obtain such a certificate it must submit to a secret election and obtain a majority of the votes cast.

### Order

And now, to wit, June 17, 1944, the appeal of the Retail Clerks International Protective Association, Local No. 1365, and of the Pennsylvania State Federation of Labor, intervening defendant, is sustained, and it is ordered and adjudged that the final order of the Pennsylvania Labor Relations Board of October 22, 1943, be and the same is hereby reversed and set aside.